Good morning, Your Honors. Sandra Harani, Federal Defenders, on behalf of Defendant Appellant Jorge Cordova-Villa. The sole dispute in Mr. Cordova's trial, and the only element that was being contested, was his intent upon attempting to reenter the United States. And the multiple errors in this case each contributed to undermining his defense that he came to be arrested. First, the government lowered its burden to prove the intent element by misstating the law in its rebuttal closing argument, and the district court failed to neutralize the harm caused by the government's incorrect statement. And second, the district court erred by refusing to give the missing witness instruction requested by Mr. Cordova by using the wrong legal rule. As to the first, is your contention that they misstated the law of, the substantive law of what it meant to enter the United States, or is it that they left out the intent part? Your Honor, it's that they left out the intent element. But they weren't talking about that. I mean, they were, in other words, the law has two pieces. You have to intend, and what do you have to intend to do? And so I understood that what they were talking about was what did you have to intend to do. Respectfully, that's incorrect, Your Honor. The very first thing the government said was the jury instruction doesn't say come into the country in order to go live at large. That's the intent element, in order. But then the second sentence, they did a bait and switch, and it said it is coming into the country and you are at large. So they started with the intent, and then they immediately removed the intent. And so that's where we can see that they were misstating the law as to this offense. And even as we go to the sidebar, the very first question the judge asked the government was what is your theory? And the government's very first answer was it's my understanding that you are at large the moment you're inside the country. If the government was trying to, let's say, explain further the intent element or, as they argued in their briefs, respond to the defense's closing argument, they would have said it doesn't say in order to go live at large. It says in order to be at large. But they would have kept the in order, the intent element. What do you expect them to be saying, frankly? Your Honor, I don't believe so. I think that because they say – The very first sentence of the prosecution's rebuttal is let's be clear. The jury instruction doesn't say come into the country in order to live at large. Right. And then their next sentence – But to live at large as opposed to be at large. Correct, Your Honor. And then they tried to explain the difference between live at large and be at large. But, Your Honor, what they did was – Do you quarrel with the second part? Do you quarrel – I mean, do you think that they were wrong in saying that if you are 10 feet on the other side of that fence – Now, I know that what they left out was there is a bunch of law about if you're under surveillance, you can not be free of restraint. But that doesn't seem to be in dispute here. So aside from that nuance, is the statement about what it means to be in the country free of surveillance inaccurate? Yes, Your Honor. Why? The government statement here was inaccurate because it is saying – again, and I think that this point is very important – it took the in order to go live at large. The in order is the intent element. That's not what I asked you. And it removed it. I asked you whether their statement leaving out the intent part of it, their statement with regard to the substantive piece of what it is you have to intend to do, was that inaccurate? I understand you think that they left off the intent and that was misleading. But was it inaccurate as to what it means to be in the country, to have come to be in the country free of restraint? Was that inaccurate? The statement about what it means to be at large was not inaccurate, if that's what the Court is asking me. Okay. Except for this little glitch that I noticed, but nobody seems to care about that. I'm sorry, Your Honor? Except for this little glitch that I noticed, but it doesn't seem to matter here. Your Honor. The surveillance part. Yes, of course. At that point, we hadn't gotten into the details of the official restraint and what that means. But what I would note is a few things. First of all, Mr. Cordova took the stand and he admitted on the stand every element,  He admitted that he crossed. He admitted that he crossed with a group. He admitted that he was walking inside the United States. And so the problem with what the government did here was it basically gave itself almost a directed verdict. It got up and said, it's not in order to go live at large. It is you are at large, whether for 10 feet and so on. And so what it did was it took what Mr. Cordova testified to and gave itself a verdict of guilty. There could be no other verdict if he was at large at 10 feet and his intent didn't matter. And I think it's important that the district court saw the problem. I think it's important that the district court had a nine-minute sidebar to talk about this. I think it's even more important that this court has noted very recently in Castillo-Mendez how confusing this aspect of the law is. This court said that the jury instruction as to this is not a model of clarity, that it is confusing. And so what we're talking about is the only contested element. Being spoken about in rebuttal. And, you know, like I said, it was an element that he had, not an element, but it was a fact that he admitted that he was at large once he was inside the country. It's a confusing element that this court has recognized as confusing. And then ultimately the district court never ruled on the objection, neither before or after the sidebar. The district court did not get a curative. The district court did not turn the jury back to the instructions already stated. And so I think all of those do go together to say that this was a problem. I mean, that this was really going to weigh the scales very far in favor of the government. Just because I'm curious, or I've forgotten, where does this intent element come from? Your Honor, it started, I believe, with case law. So the court said in Lumbera-Valdivinos that it would read in this element for attempt, that there needs to be this specific intent to be, to come from a... But why is this intent if he actually was there? That's what I couldn't understand. Why is he being charged with attempt to enter when they actually found him there? The problem being because it doesn't meet the fountain for some reason, or because... I'm just wondering why we're even here. I know we are, but I'm just curious. Your Honor, it's hard for me to speculate as to why the government makes the charging decisions... But it was charged as an attempt to enter. Yes. He was originally... As an entry. Not as an entry. He was originally charged by complaint with found in. But when the indictment came down, it was two counts, a misdemeanor count and a felony count. And it wasn't enter, it was attempt to enter. For both. That's correct. Why the change occurs... Because that's the way it was charged, that's the way it was charged. That's the way it was charged, Your Honor. But I do think the court's point turns back around to another interesting aspect of this, which is... It almost brings into question issues of double jeopardy. If the government can get up in its rebuttal closing argument, essentially argue that guilt is based on the same as the found in elements, and then later, if they don't win that way, try to do a found in, where Mr. Cordova was charged with attempt, and he presented a full defense based on the attempt charge. And so I really don't think it can be really understated how important this statement was based on its timing, the point of the law that it was focusing on, which, like we said, was confusing, a point Mr. Cordova took the stand and admitted, and so on. I see that I have two minutes left. I would like to reserve time for rebuttal. Thank you, Your Honor. Good morning again, Your Honors. Mark Raihey for the United States. All due respect, Your Honor, I think defense is making a mountain out of a molehill. This whole claim comes down to three sentences on excerpt of Record 320. The first thing that the prosecutor is arguing in rebuttal is in response to two errors by defense counsel at excerpt of Record 309 and excerpt of Record 319, where she uses the phrase, live at large. When he says in his first sentence, let's be clear, the jury instruction doesn't say, come into the country in order to go live at large, period, that is 100% accurate. When he says in his next sentence, that isn't what the law is with regards to this, that's also 100% accurate. His next statement isn't even a complete sentence. He says, it is coming into the country and you are at large, and whether or not he is at large for 10 feet on the other side of that fence, 100 feet, a quarter mile or a half mile objection, they go to sidebar. At sidebar, Judge Hayes is sharp. He saw that this could be confusing language. He wanted to head this off at the pass. He flushes out with the prosecutor, well, where are you going with that language? There wasn't a lot, there wasn't any talk about that in the initial summation. And then the prosecutor says, well, it was in response to those two statements, living at large, and then there's a lot of back and forth all outside the presence of the jury about what this intent element requires. And then thereafter, even the defense, I think they admit in their own brief, at page 24 of the opening brief, when the government resumed argument, it did not return to the same line of argument but moved on entirely. Just because I'm curious, why are these charges attempt offenses? I wondered the same thing in my hotel when I was preparing. It's sort of generally done that way because Castillo-Mendez is the same. The only thing I sometimes, you know, there might be concern. Years ago when this whole official restraint really kind of blew up, sometimes there was ambiguity about whether the alien was under continual surveillance. When you've got the scope operator, and, you know, this was a mile from the border. Reason, because there was a scope operator. Right, so maybe that's the only thing that I can infer exactly. But, you know, be that as it may, again, I mean, I appreciate defense counsel's passion or advocacy, but I would simply say this isn't misconduct. It's not a misstatement of the law. And this court gives great deference to the district judge who's on the scene, who's seen the entire trial. At the end of argument, when the defense moved for mistrial, again, at page 333 of excerpts of record, Judge Hayes says, I don't think there's any misconduct. I don't think that a cure of instruction is necessary. The only concern that I had was whether or not the term going at large would have been conflated or misapplied. And he also said at excerpt page, excerpt of record, I believe, page 326, that the reason he had the sidebar, my concern was whether or not there was going to be an argument that would either be mishandled or inaccurate. So that being said, I mean, it wasn't an actual argument to begin with. The Supreme Court in Donnelly v. De Cristoforo says you shouldn't assume that a jury gives the worst possible inference to ambiguous remarks when there's a plethora of other interpretations. And Judge Hayes did exactly what he's supposed to. He acted as a gatekeeper. He saw an issue and he took care of it. So as far as other than that, I don't really know what else to say about this intent. Defense counsel's right. That was the sole issue, whether he intended to come back to get caught or not. Both sides argued that to the hilt. And absent this claim that there was a misstatement of law, which, again, I just don't see that, I guess we would submit unless the court has any questions about the other issue on appeal. She didn't say anything about the missing witnesses, but is there anything you want to say about that? Only, yeah, maybe one thing, Your Honor. There is an allegation. Again, you know, I didn't write this brief. When I'm preparing, I'm like, wow, they, you know, she says we requested the identities of these people for months, and the government only gave it two weeks to trial, prior to trial. I looked through the record every single page. There was never a request for that. Her excerpts are two pages, 51 and 52 excerpt of record. That was when, after the close of evidence, the defense raised the issue of the missing witness for the very first time. And when you look at, Judge Hayes was understandably frustrated. And when he says, well, this is the first time hearing about this. Usually parties bring this up before trial. If you would have let me know there was an issue, I would have held a hearing. If there would have been some kind of an issue, I would have given you the information you want. But there was none of that. And the defense, we didn't know what the defense was, that it would be that he's coming back to get treatment for his disease until trial. He defended himself, testified that I didn't tell any of the other people who I was with what my plan was. The evidence was that it happened at night, past 8 p.m., out in the wilderness, there's no lights. What I'm getting at is not only was there not a repeated request for these witness identities, under that second prong of Lee Aldell-Carmen's two-pronged test for missing witness, it was entirely speculative that these witnesses could have had anything exculpatory. And even Lee Aldell-Carmen says the government is free to deport witnesses where there's no basis for believing that they have exculpatory evidence. And I appreciate, I know my opponent didn't bring it up. You were kind enough to give me an opportunity to put that in the record. And with that, I would submit. Thank you, Your Honor. I'll start with the missing witness instruction. A few things. Mr. Cordova told the agents the moment that they found him in the hills that he was HIV positive, and that was in the record. It was in the record that they gave him a mask because of his illness, that they searched for the few medications he had with him, but they couldn't find them in the hills. And so the idea that this was a big surprise to everybody is not true. It was known from the beginning of the case that he was HIV positive. They said he was HIV positive, but not that that was his defense. No, Your Honor, but I would say that I don't think the defense has a burden to tell the government exactly how they're going to run the case. What efforts did you make prior to raising this way late in the game to either get the identities or to request depositions to get subpoenas issued, that kind of thing? Your Honor, the requests that were cited in the request for the jury instruction were by email to the prosecutor, the first prosecutor who was on the case, asking for the identities of the witnesses so that we could. When? As soon as the case was indicted and was going towards trial, that is when the requests for the identities started. When we got those identities, we realized it was too late. How much after you asked for them? I'm sorry? How long after you asked did you get them? Two weeks before trial, and so that was about six or seven months, I believe. He was indicted in July, and then his trial went forward, I believe, the following February. But tell me if I'm wrong. I guess I'm inclined to fault you all for why this arose this way. Don't you normally either move ex parte for the issuance of subpoenas for these folks or if you're not going to be able to bring them here to get depositions taken in a foreign country? We do, Your Honor, but the issue there is we have to have the identities to subpoena them, and so the problem that was faced by the defense was it was impossible to even investigate these individuals to find out what their testimony would be because the government had complete possession of their identities. Did you ever give anybody any education that you might want to call these people? Other than requesting the identities, Your Honor, no, but I think it was obvious from the way the case was going that the reason we were asking for those identities was so that we could interview those individuals. So I think the request themselves is the indication. In trial, we ask for the identities of agents, recipient witnesses, different things, so we can interview those individuals and find out if they could be helpful to the case. Yes, I can tell. The only thing these people could possibly have, given what was common ground between the parties, it seemed to me the only thing that these people could possibly have testified to is whether he was lying down or sitting up. I think they could have testified to a few things including that, Your Honor. This case was a credibility battle between... And that would be difficult because it was dark, but leave that alone. Go ahead. This case was a credibility battle between the arresting agent and Mr. Cordova. Well, right, but the question is whether there was anything they would have observed or known that was being disputed that could have mattered. Right, and every point of corroboration to Mr. Cordova's testimony would have been a step in his favor in this case because it was a credibility battle. I thought that the government, it wasn't clear to me from your opening brief, but it seemed pretty clear by the end of the briefing that there really wasn't a dispute about whether he was the guy in the middle of the trail. Correct. The agent said he could have seen... So he's the guy in the middle of the trail. He says he didn't tell them anything about his plans, so they're not going to be able to testify to that. And so what other than whether he was lying down or sitting up could they testify to? A few things.  They said, we can't tell who was where, I have no idea, so we'll just move forward and talk about the person in the trail and what we observed. So even if the person arrested the closest to him, which was very close, could say, yes, he was the one in the path, that would have been important. And if each other individual could identify where they were arrested, it wouldn't have been, well, we're not sure, but we'll accept it for the sake of argument. It would have been, no, he's right. He went and he sat down in a path. Yes, the person closest might have been able to testify as to sitting or laying down. He did not tell them his specific diagnosis. He did, however, comment on the symptoms he was experiencing, and those individuals... I'm sorry, Your Honor. I'm sure that nobody was doubting that. Well, but... No one was even particularly doubting whether he was coming to the United States to get treatment. The question is, how was he doing that? Correct. But I think if he had exhibited the symptoms he was saying he exhibited, it would have lent credibility to the idea that he didn't want to wait and wander into America. He wanted to be arrested. Isn't all this speculative? I mean, the key is you have to show that the testimony would have been unfavorable to the government. And you don't know what they would testify to. There's a few responses, Your Honor. First of all, focusing on the speculative, or focusing, I'm sorry, on the second test, the proper test for material witness instruction, I just need to show a reasonable inference. Mr. Cordova needs to show a reasonable inference. He doesn't need to prove up the facts. And so I think in the light of everything we were able to retrieve from what we had, we were able to show that reasonable inference. But even aside from that, the problem with the words that the judge used is it was completely tied to what the government knew before it deported these individuals, which means it was completely tied to the only test he ever mentioned, which is the test for granting the dismissal. And so he never even acknowledged that there was a separate and second test. And so I think under this Court's decision in Hinkson, even just on that fact alone, the Court must reverse. Okay. Thank you very much for your argument. Thank you, Your Honor. The case of United States v. Cordova-Villa is submitted, and we'll go to the last case of the day, United States v. Fernandez-Escobar.
judges: Fisher, Berzon, Watford